

**In The**
**Court of Appeals**
**Sixth Appellate District of Texas at Texarkana**

_____

No. 06-08-00128-CR
_____

CORDARIAN HENDERSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 124th Judicial District Court
Gregg County, Texas
Trial Court No. 35417-B

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

Charged with two counts of aggravated sexual assault of a child, Cordarian Henderson's defensive theory was that his eight-year-old victim had made up these allegations of sexual abuse as a result of having a fanciful imagination—an imagination that was the unfortunate product of being physically abused by his mother and of having what seemed to be unfettered access to pornographic videos. But for the pornography and being abused by his mother, the victim would never have "made up" these claims against Henderson—or so went Henderson's theory of the case.

Henderson's jury disagreed with this defensive theory and found Henderson guilty of two counts of aggravated sexual assault. The jury assessed his punishment at ten years' imprisonment on each count. Henderson now appeals, claiming that the evidence is insufficient to support his conviction and that his ten-year sentences are disproportionate to his crimes. We overrule both issues and affirm the trial court's judgment.

*(1)     The Evidence Is Legally and Factually Sufficient To Support the Jury's Verdict*

Henderson contends the evidence is legally and factually insufficient to establish that he committed either of the two counts of aggravated sexual assault for which the jury found him guilty.

A legal sufficiency review requires an appellate court to ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard mandates that the reviewing court accord deference to the fact-finder's

2

duty to resolve conflicts in testimony and other evidence. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). This review standard requires an examination of all the evidence, both that which was properly admitted and that which was improperly admitted, to determine whether the cumulative force of all the evidence (direct, circumstantial, or both) supports the verdict when such evidence is viewed in the light most favorable to that verdict. *Id.*; *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). During this review process, the court measures the evidence against the elements of the offense as defined in a hypothetically correct jury charge for the case. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

A factual sufficiency review has subtle differences. "Evidence may be factually insufficient if: '1) it is so weak as to be clearly wrong and manifestly unjust or 2) the adverse finding is against the great weight and preponderance of the available evidence.'" *Berry v. State*, 233 S.W.3d 847, 854 (Tex. Crim. App. 2007) (quoting *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000)). "Such a factual sufficiency review requires the reviewing court to consider all of the evidence." *Id.* (citing *Marshall v. State*, 210 S.W.3d 618, 625 (Tex. Crim. App. 2006)). "A clearly wrong and unjust verdict occurs where the jury's finding is manifestly unjust, shocks the conscience, or clearly demonstrates bias." *Id.* (citing *Sells v. State*, 121 S.W.3d 748, 754 (Tex. Crim. App. 2003);

3

*Santellan v. State*, 939 S.W.2d 155, 164 (Tex. Crim. App. 1997)).  As in a legal sufficiency review, the hypothetically correct jury charge construct is employed in assessing the factual sufficiency of the evidence.  *Vega v. State*, 267 S.W.3d 912, 916 (Tex. Crim. App. 2008).

One way in which the crime of aggravated sexual assault can be committed is if the actor intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means and the victim is younger than fourteen years of age.  TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(2)(B) (Vernon Supp. 2008).  Another way the crime of aggravated sexual assault can be committed is if the actor intentionally or knowingly "causes the sexual organ of a child to contact or penetrate the mouth, anus, or sexual organ of another person, including the actor" and the victim is younger than fourteen years of age.  TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii), (a)(2)(B). These two methods of committing aggravated sexual assault were alleged as alternative paragraphs in Count I of the grand jury's indictment, the count alleging that offenses occurred April 1, 2006. The named victim for both alternative paragraphs was the same:  John Doe 08201999.[1]

Count II of the grand jury's indictment also contained two alternative allegations.  These alternative allegations mirrored the allegations contained in Count I of the indictment, except that these offenses were alleged to have occurred April 15, 2006.  The named victim for both paragraphs of Count II was the same as Count I:  John Doe 08201999.

---

[1]John Doe 08201999 is a pseudonym.

4

With respect to the first paragraph of either count of the indictment, the applicable hypothetically correct jury charge would require the State to bring forth proof of the following elements: that Henderson (1) intentionally or knowingly, (2) caused the penetration of the victim's anus, (3) by any means, and (4) the victim was younger than fourteen years of age. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i), (a)(2)(B). To satisfy its burden of proof under the second paragraph of either count of the indictment, the applicable hypothetically correct jury charge would require the State to bring forth proof that Henderson (1) intentionally or knowingly, (2) caused the victim's sexual organ to contact the mouth, anus, or sexual organ of any person; and (3) the victim was younger than fourteen years of age. *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(iii), (a)(2)(B). With this framework in mind, we turn now to a review of the evidence admitted at trial.

The State called four witnesses during its case-in-chief: Doe (the victim), Nakiesta Myles, Bunny Terrell, and David Cheatham. Henderson called six witnesses to testify on his behalf: Cherelle Garrett, Chere Turner Kabeta, Janice Mary Coger, Kim Robison, Stacey Lee Myers, and Henderson himself. The jury also viewed a recorded interview of Doe conducted at the Child Advocacy Center and a recorded interview of Henderson conducted at the Longview Police Department. What follows is a summary of each witness' testimony and the contents of those recorded interviews.

5

*(a)     Nakiesta Myles*

Nakiesta Myles is the mother of Doe, whose date of birth is October 20, 1999. Myles and Doe lived in a Longview apartment complex in 2005.[2] While living at the complex, Myles met Robison, Henderson (who was Robison's son), and Cherelle Garrett (who was Robison's daughter). Robison and Henderson would alternately babysit Doe when Myles had to work. Garrett would also sometimes babysit Myles' three children. Eventually, Henderson became Doe's primary babysitter when Myles had to work. At some point, Myles and Doe moved into Robison's apartment.

One afternoon, Myles walked into Doe's room and caught him doing "inappropriate" things with one of Myles' twin daughters. Doe then told Myles that he learned how to do this from Henderson, who had previously done the same inappropriate thing to Doe. Doe later explained that, while Myles had been at work, Henderson once tried to insert his penis in Doe's behind. Doe reported to his mother that the sexual assault hurt and that Henderson would not discontinue the assault despite Doe's muffled pleas to stop. Myles was unsure whether Doe said that Henderson actually inserted his penis into Doe's anus or that Henderson's penis had only touched the outside of Doe's anus. Myles' subsequent examination of her son revealed he had no observable physical injuries to his anus, so Myles did not personally believe that Henderon had actually been able to

---

[2]Myles reported her son was, at the time of trial, finishing his third-grade year of school in Kilgore. Doe has been diagnosed with attention-deficit-hyperactivity disorder and reportedly has had behavioral problems at school. Myles also said Doe was behind his peers in his academic level, but that he was starting to catch up and was enjoying school. She also reported that his behavioral problems had improved slightly during the just-ended academic term.

penetrate her son's anus; this examination occurred, however, some length of time after the last suspected sexual assault. Myles testified that she remembered once seeing blood in Doe's stool sometime around April 2006.

Henderson also reportedly made Doe watch pornographic movies. Once he was interviewed at the Child Advocacy Center, Doe revealed the sexual assaults occurred several different times. According to Myles, Doe has been wetting his bed and having nightmares that involved Henderson since the date of the last sexual assault.

*(b)     Doe*

Doe told the jury he was currently in third grade. He currently lives in Kilgore with his mother, sisters, and several members of his extended family. He previously lived at an apartment complex in Longview called Ware Meadows, at which time he was seven years old. When he lived in Longview, Doe would sometimes go to Robison's apartment after he got home from school and before his mother got home from work. Both Robison and Henderson would periodically babysit Doe at either Myles' apartment or at Robison's apartment.[3]

Doe explained to the jury that Henderson had shown his "private part" to Doe.[4] Doe then told the jury that Henderson stripped Doe of his clothes, after which Henderson put his private part "in" Doe's anus. Doe further explained that, by using the word "in," Doe meant that Henderson actually

---

[3]Doe identified Henderson in open court.

[4]The record reflects that the child victim was afraid to testify at trial about the sexual assaults.

7

inserted his penis into and inside Doe's own body. The assault hurt "[a] lot." Henderson reportedly assaulted Doe in this manner on three different occasions: first at Robison's home, later at Myles' home (at Longview's Ware Meadows apartment complex), and at the home of Henderson's grandmother. Doe also told the jury that he had previously watched a pornographic movie with Henderson and Henderson's girlfriend.

Finally, Doe denied the claim that Henderson had touched Doe's penis during the first sexual assault. However, with respect to the second, assaultive episode, Doe agreed that Henderson did touch Doe's penis during that nonconsensual encounter.

*(c)     Bunny Terrell*

Bunny Terrell is a medical social worker with the Child Advocacy Center in Longview. Terrell told the jury that her position with the Center requires her to conduct forensic interviews of children between the ages of two and seventeen when those children have made outcries of abuse. Terrell explained that many of her interviews involve cases of a "delayed outcry," a term that means "something has happened to the child and there's been a period of time before the child has revealed that something has happened." Most often, according to Terrell, an abuser is someone who already has a close relationship with the child. Terrell informed the jury that no sexual assault medical examination was made of Doe in this case because he had delayed for several months before making an outcry of sexual abuse; the passing of time would have allowed the body to heal, resulting in a

8

complete absence of any medically valid information to connect the accused with these alleged sexual assaults.

On cross-examination, Terrell told the jury that Doe has said Henderson "put his middle part *on* my [Doe's] butt." (Emphasis added.)

*(d)     David Cheatham*

David Cheatham is a detective with the Longview Police Department. Cheatham conducted the investigation into Doe's outcry of sexual abuse, which ultimately resulted in Cheatham's decision to seek an arrest warrant for Henderson. When Cheatham and several other uniformed police officers went to Henderson's home to execute that arrest warrant, they first knocked on the door to Henderson's apartment. The officers waited "some time" before Robison finally opened the door. The officers then began searching throughout the home for Henderson, whom they eventually found hiding beneath a bed.[5] Henderson was then forcibly removed from beneath the bed, handcuffed, arrested, and transported to jail.

---

[5]During his own later testimony, Henderson tried to explain that he hid from the police because he lived within a culture at the Ware Meadows Apartments that was generally distrustful of police officers. He told the jury that any time the police come to that apartment complex, the residents for whom the police are looking will generally attempt to hide. Henderson also reportedly hid because he thought the officers were attempting to arrest him for unpaid traffic tickets.

Once at the jail, Henderson agreed to waive his *Miranda*[6] rights and speak with officers about the charges against him.[7] Henderson repeatedly denied molesting Doe.

Due to the lapse of several months between the alleged incident and the child's ultimate outcry, Cheatham decided not to send Doe for a sexual assault medical examination because "[t]here wouldn't be any physical evidence, not normally, not after that time frame." Cheatham also informed the jury that the State had used a pseudonym for the victim in this case, that pseudonym being "John Doe 0820199." Cheatham's continued testimony linked this pseudonym to the child victim from whom the jury had heard earlier.

During cross-examination, Cheatham's police report in this case was admitted into evidence. Cheatham's report stated Myles initially reported that she did not believe Henderson penetrated Doe's anus during the assault. Cheatham explained that Doe had neither, at the time of Myles' initial report, disclosed to his mother that Henderson had actually penetrated the anus during the sexual assault, nor exhibited any physical symptoms of such penetration.

*(e)     Cherelle Garrett*

Cherelle Garrett is Henderson's younger sister. She lived with Henderson and their mother in 2006 and frequently babysat Doe. Garrett never witnessed any type of inappropriate behavior

---

[6]*Miranda v. Arizona*, 384 U.S. 436 (1966).

[7]Cheatham testified that Henderson did not ask for an attorney at any time. The recording of the interview also does not suggest Henderson made any request for an attorney, but instead willingly waived his right to counsel and answered the detective's questions.

between Henderson and Doe during the relevant time period. She testified that she did, however, witness an episode in which Myles physically abused Doe by beating him with a belt, kicking him, and punching him with her fists. Garrett also testified that she witnessed Myles hit Doe's head against a wall, which resulted in Doe suffering visible, physical injuries and caused him to miss school the next day. Garrett claimed there were other instances of physical violence by Myles toward her son. Garrett then testified that Doe has a reputation for being untruthful and that she has witnessed Doe in this case watching pornographic movies.

*(f)     Chere Turner Kabeta*

Chere Kabeta used to live at the Ware Meadows Apartments in Longview. Henderson babysat Kabeta's son and daughter. Kabeta never witnessed Henderson act inappropriately with her children during this time; she had no reason to suspect any such inappropriate conduct by Henderson. When the current charges were brought, Kabeta confronted her son (who was eight at the time Henderson babysat him) about whether Henderson had similarly molested him. Kabeta's son repeatedly denied being molested by Henderson. And other than Doe's outcry, Kabeta has never heard molestation accusations made by any other child that Henderson previously babysat. Kabeta would even allow Henderson to continue babysitting her children today.

*(g)     Janice Mary Coger*

Janice Coger is Henderson's grandmother and lives at the Ware Meadows Apartments. Coger testified that she witnessed Myles beating Doe, slapping him, and locking him in the trunk of her car.

11

She also testified that Doe had a reputation for being "known as a big liar." Coger was unaware that Henderson himself had been previously sexually assaulted.

*(h)   Kim Robison*

Kim Robison is Henderson's mother. She lived with Henderson during the time in question and would babysit Doe. She once found a pornographic videotape in Doe's room. Robison also testified that Doe is known to tell lies.

On cross-examination, Robison admitted that she had once been raped and had waited a long time before telling anyone about it. She also admitted that Henderson had only recently revealed to her that he had been molested as a young child.

*(i)   Stacey Lee Myers*

Stacey Myers lived at the Ware Meadows Apartments at the same time as did Henderson. Henderson lived with Myers for a time and took care of her teenage son when she was working. Myers never witnessed Henderson engage in any inappropriate behavior such as watching pornographic videos while her children were present.

*(j)   Henderson*

Henderson next testified in his own defense. He told the jury that he sometimes babysat Doe. Henderson testified that Doe would not behave when Henderson took care of the child. Henderson denied molesting Doe or doing anything to hurt the child.

On cross-examination, Henderson told the jury that he began babysitting Doe in November or December 2005. During the subsequent months, Henderson often spent the night at Myles' apartment, taking care of her children while she worked. This care included taking Doe to the barber or the mall, among other things. In exchange, Myles reportedly promised to pay Henderson $20.00 each week; Henderson was also given permission to use Myles' home telephone line and had access to her internet service. In January 2006, Myles and Doe moved into the apartment where Henderson and his family lived. The next month Henderson stopped babysitting Myles' children for two reasons: First, Myles stopped giving Henderson the promised $20.00 per week payment. Second, Henderson moved out of his mother's home and into the home of his cousin. Henderson testified that he never had any close contact with Doe after Valentine's Day 2006.

Henderson next told the jury that he personally observed Doe in this case watching a pornographic movie that Myles had absentmindedly left in her video player after a previous night's romantic interlude. (The movie apparently got stuck in the video player; Henderson told the jury that he had to use a butter knife to remove the disc from the video player). He also testified that he had seen Myles physically abuse her son in December 2005 and on at least five other occasions.

Finally, Henderson told the jury that he had himself been sexually abused as a child and admitted that he waited about a month before he told anyone of the incident. Because he himself had been molested, Henderson told the jury that he would never want to put another child through the same pain and trauma he had experienced.

13

*(k)     Child Advocacy Interview (Defense Exhibit 1)*

Defense Exhibit 1 is a recording of Doe's interview by Terrell at the Child Advocacy Center and lasted nearly twenty-seven minutes. At the beginning of the video, Terrell asks Doe to identify statements that are true and statements that are false. The video suggests that Doe appropriately identifies the difference between the truth and a lie and promises to tell the truth during the interview.

Early during this interview, Doe tells Terrell that he sometimes spends the night at Henderson's home. Terrell then asked Doe why he was at the Center. Doe responded, "He [Henderson] put his middle part *in* my butt." (Emphasis added.) Doe told Terrell that he did not have his clothes on at the time Henderson committed the assault on a bed at Henderson's home. Doe also reportedly told Henderson to stop the assault, but Henderson would not cease. Henderson was also reportedly wearing "red jean pants" at the time he assaulted Doe. Doe repeatedly told Terrell that Henderson's penis went in and out of Doe's anus several times during each of the assaults that occurred over a period of three different, consecutive days.[8] The assaults occurred at night according to the recorded interview.

---

[8]Doe would later say that Henderson "stayed still" after he put "his middle part in" Doe's anus. Terrell did not ask Doe to clarify this apparent discrepancy among his various statements surrounding the facts of the multiple sexual assaults described during the interview's entirety.

14

Doe next told Terrell that he had seen Henderson watching "nasty movies" on several occasions that Henderson reportedly got from his cousin. Henderson also reportedly paddled Doe on several occasions. When asked by Terrell, Doe denied being sexually assaulted by anyone else.

*(l)     Henderson's Jailhouse Interview (State's Exhibit 1)*

Henderson was eighteen years of age at the time of his custodial interview by Detective Cheatham. The video begins with Cheatham reading the *Miranda* warnings to Henderson, then Henderson is given a written copy of the warnings (which he initials as an indication of his understanding of the warnings and the consequences of waiving his *Miranda* rights). Henderson acknowledges that he was hiding underneath his bed when the officers came to arrest him. Henderson explains that he previously babysat Myles' children, including Doe. Henderson and Doe sometimes would go to the mall, McDonalds, or the barber shop together. Henderson repeatedly denied molesting Doe. Henderson acknowledged owning a pornographic video. Henderson, however, denied watching pornography with Doe or while Doe was in a location where he could see Henderson watching pornography.

Henderson then told Cheatham about being molested by a teenage cousin. Henderson said the cousin performed oral sex on Henderson and attempted anal intercourse on Henderson.

Finally, Henderson told investigators he believed that Doe had made up these accusations of sexual molestation as a result of Doe being repeatedly, physically abused by Doe's own mother.

15

*(m)*     *Analysis*

Viewing the above-summarized evidence in the light most favorable to the jury's verdict, we conclude that the jury had before it evidence from which it could determine that Henderson (1) intentionally or knowingly, (2) caused the penetration of Doe's anus, (3) by any means (in this case, Henderson's penis), and Doe was younger than fourteen years of age on or about April 1, 2006. The jury also had before it evidence that Henderson (1) intentionally or knowingly, (2) caused the penetration of Doe's anus, (3) by any means (in this case, Henderson's penis), and Doe was younger than fourteen years of age on or about April 15, 2006. We therefore conclude that legally sufficient evidence supports the jury's verdict, as evaluated under the required hypothetically correct jury charge standard.

We similarly conclude the evidence is factually sufficient when measured against the hypothetically correct jury charge. While there are factual conflicts and discrepancies among the various witnesses' testimonies and among the exhibits, it was ultimately the jury's province to resolve these conflicts. Based on the above-summarized record, we cannot say the jury's resolution of the facts is against the great weight and preponderance of the evidence. We therefore overrule Henderson's challenges to the legal and factual sufficiency of the evidence to support his convictions.

*(2)*     *Henderson Did Not Preserve His Disproportionate Sentencing Claim*

In his final point of error, Henderson contends his ten-year prison sentence is disproportionate to his crime, citing *Solem v. Helm*, 463 U.S. 277 (1983).

16

Texas courts have traditionally held that, as long as the punishment assessed is within the range prescribed by the Legislature in a valid statute, the punishment is not excessive, cruel, or unusual. *See*, *e.g.*, *Jordan v. State*, 495 S.W.2d 949, 952 (Tex. Crim. App. 1973). Here, Henderson's ten-year sentence falls within the applicable range of imprisonment for a term of between five and ninety-nine years, or for life. *See* TEX. PENAL CODE ANN. § 12.32 (Vernon 2003).

That does not end the inquiry. A prohibition against grossly disproportionate punishment survives under the Eighth Amendment to the United States Constitution apart from any consideration of whether the punishment assessed is within the range established by the Legislature. U.S. CONST. amend. VIII; *see Solem*, 463 U.S. at 290; *Harmelin v. Michigan*, 501 U.S. 957 (1991) (Scalia, J., plurality op.); *Jackson v. State*, 989 S.W.2d 842, 845 (Tex. App.—Texarkana 1999, no pet.); *Lackey v. State*, 881 S.W.2d 418, 420–21 (Tex. App.—Dallas 1994, pet. ref'd); *see also Ex parte Chavez*, 213 S.W.3d 320, 323 (Tex. Crim. App. 2006) (describing this principle as involving a "very limited, 'exceedingly rare,' and somewhat amorphous" review).

*Solem* had suggested, as a three-part test, that an appellate court consider: (1) the gravity of the offense compared with the harshness of the penalty; (2) the sentences imposed for similar crimes in the same jurisdiction; and (3) the sentences imposed for commission of the same crime in other jurisdictions. *See Solem*, 463 U.S. at 292. *Harmelin* at least raised questions about the viability of the *Solem* three-part test. In fact, it was subsequently held that proportionality survived *Harmelin*, but that the *Solem* three-part test did not. *See McGruder v. Puckett*, 954 F.2d 313, 316 (5th Cir.

17

1992); *Dunn v. State*, 997 S.W.2d 885, 892 (Tex. App.—Waco 1999, pet. ref'd); *Lackey*, 881 S.W.2d at 420–21. In light of *Harmelin*, the test has been reformulated as an initial threshold comparison of the gravity of the offense with the severity of the sentence, and then, only if that initial comparison created an inference that the sentence was grossly disproportionate to the offense should there be a consideration of the other two *Solem* factors—(1) sentences for similar crimes in the same jurisdiction and (2) sentences for the same crime in other jurisdictions. *McGruder*, 954 F.2d at 316; *Mullins v. State*, 208 S.W.3d 469, 470 (Tex. App.—Texarkana 2006, no pet.); *Dunn*, 997 S.W.2d at 892; *Lackey*, 881 S.W.2d at 420–21.

Henderson did not object to his sentence at the trial court level on the ground that a ten-year prison sentence was disproportionate to his crimes (or on any other ground) at the time it was announced or later when it was imposed. His motion for new trial, however, contains a contention that the sentence was disproportionate to the offense. A motion for new trial is an appropriate way to preserve this type of claim for review. *See Williamson v. State*, 175 S.W.3d 522, 523–24 (Tex. App.—Texarkana 2005, no pet.); *Delacruz v. State*, 167 S.W.3d 904 (Tex. App.—Texarkana 2005, no pet.).

There is no evidence in the record, however, comparing the sentences imposed on persons in Texas with sentences imposed against defendants in other jurisdictions who committed a similar offense. *Mullins*, 208 S.W.3d at 470; *Alberto v. State*, 100 S.W.3d 528, 529–30 (Tex. App.—Texarkana 2003, no pet.); *see Fluellen v. State*, 71 S.W.3d 870, 873 (Tex. App.—Texarkana

18

2002, no pet.); *Latham v. State*, 20 S.W.3d 63, 69 (Tex. App.—Texarkana 2000, pet. ref'd). Accordingly, Henderson has not brought forth a record on which this issue may be properly evaluated, and his claim must be overruled.

For the reasons stated, we conclude the evidence is factually and legally sufficient to support the jury's verdict. We also hold that Henderson has not brought forth an adequate record on which we can evaluate his claim that his ten-year prison sentence for two counts of aggravated sexual assault is disproportionate to his crime.

We affirm the trial court's judgment.

                                                Josh R. Morriss, III
                                                Chief Justice

Date Submitted:      March 23, 2009
Date Decided:        April 16, 2009

Do Not Publish

19